[Crim. No. 278. First Appellate District.—November 23, 1910.]

THE PEOPLE, Respondent, v. ABRAHAM RUEF, Appellant.

CRIMINAL LAW—OFFERING BRIBE TO SUPERVISOR—OFFICIAL VOTE FOR FRANCHISE—PROVINCE OF JURY—SUPPORT OF VERDICT.—Upon the trial of an indictment for offering a bribe to a supervisor to influence his official action in voting for a trolley franchise the jury is the sole judge of all questions of fact, and its verdict upon any controverted question is conclusive on this court. It is held, upon a review of the evidence, that it not only supports the verdict of the jury, but also that no other verdict could reasonably be justified.

ID.—TECHNICAL ERROR NOT AFFECTING SUBSTANTIAL RIGHTS DISREGARDED.—Where the defendant has been found guilty under a valid indictment, and the evidence supports the verdict, the court must give judgment without regard to technical errors or defects not affecting the substantial rights of the defendant.

ID.—TRIAL—QUALIFICATION OF JURORS—OPINION FOUNDED ON PUBLIC RUMOR OR STATEMENTS—PROVINCE OF TRIAL COURT.—Where the opinion of any trial juror is founded upon public rumor, statements in public journals, or common notoriety, it is the province of the trial court, under section 1076 of the Penal Code, to pass upon and examine the question as to whether or not the juror can and will, notwithstanding such opinion, act impartially and fairly upon the matter to be submitted to him, and the finding of the trial court thereon is like the finding of any question of fact within its function; and it is only in case of a palpable abuse of its discretion that the appellate court will interfere.

ID.—READING PUBLISHED·EVIDENCE BEFORE GRAND JURY—QUESTION AND ANSWER.—The mere fact that a juror had read in the papers statements purporting to be the testimony of witnesses before the grand jury, and perhaps in the form of questions and answers in some cases, does not make the reading of the same more than of a statement in a public journal, which·cannot disqualify the juror *per se*, if it is made to appear that notwithstanding an opinion based thereon he could and would act impartially and fairly as a juror.

ID.—DOUBT OF COURT AS TO IMPARTIALITY OF JUROR—EXCUSE OF JUROR.—If the trial judge is, from the examination of a juror or other evidence, doubtful as to whether or not the juror can and will discard his opinion, and fairly and impartially try the case, he should resolve such doubt against the juror and excuse him.

ID.—GENERAL RULE — CONCLUSIVE DECISION OF TRIAL COURT. — As a general rule, the appellate court cannot disturb the finding of the trial court as to the qualifications of any of the jurors who have merely read statements published in some public journal, and who have made the statutory showing in relation thereto, to the satisfaction of the trial court.

ID.—REPORT OF DISTRICT ATTORNEY ON QUALIFICATION OF JUROR—PRESUMPTION—FISHING EXAMINATION—ERROR NOT SHOWN.—The district attorney was not required to submit a report to his office on the qualification of a juror to the inspection of defendant's attorney, who does not know its contents, and is attempting by an improper "fishing" examination to discover the same. It must be presumed that the district attorney has used only proper means of obtaining information, and he is not required to divulge to his adversary the private information he has discovered. In no event can it be held reversible error for the court to refuse to compel the

14 Cal. App.—37

district attorney to show to defendant's attorney a paper, the contents of which do not appear in the record.

Id. — REMARKS OF JUDGE TO COUNSEL AT TIME OF RULINGS — ABSENCE OF PREJUDICIAL MISCONDUCT—INSTRUCTION.—Remarks addressed to the counsel for defendant at the time that rulings were made as to the mode of cross-examining a witness, in explanation of such rulings, though some of them might well have been omitted, and were not to be commended, yet it is held, in view of an instruction to the jury that they were not to consider any reference to or comment made by the court in connection with the admission of testimony or otherwise, that the remarks made do not constitute prejudicial misconduct, and cannot be held to have been injurious to the defendant.

Id.—STATEMENT AS TO DUTY OF WITNESS—CHARGE AS TO MATTER OF FACT OR CREDIBILITY OF WITNESS NOT INVOLVED.—A statement to counsel for defendant as explanatory of the ruling as to the examination of the witness, that the witness owed it to himself and to the interests of truth to answer prudently and carefully, did not express the opinion of the judge as to the credibility of the witness, nor constitute a charge to the jury as to any matter of fact.

Id.—EVIDENCE AS TO OTHER CRIMES—COMMON SCHEME—CONTROL OF SUPERVISORS BY DEFENDANT—USE OF PROSECUTING WITNESS AS AGENT.—Evidence as to other similar crimes of bribery committed by defendant, who was in control of the board of supervisors as a political boss, in pursuance of a common scheme to make money on deals for franchises, and to employ the prosecuting witness, who was a supervisor, as agent to deal with the other supervisors for bribes to pass the franchises, and who acted as such agent in this case, was admissible as tending to corroborate the prosecuting witness, and to show that he was employed by the defendant to commit the offense charged, and also as tending to show the motive for the crime charged.

Id.—GENERAL RULE AS TO EVIDENCE OF CRIMES UNDER COMMON SCHEME.—Where several crimes are connected as part of one scheme or plan, all of the same general character, and tending to the same common end, they may be given in evidence to show the process or motive and design leading up to the particular crime for which the prisoner is being tried, and thus tending to show logically that the crime in question was part of such common scheme. If the several crimes are part of a chain of cause and consequence, so linked as to be necessarily connected with the system or general plan, they are admissible.

Id.—CONVICTION LIMITED TO OFFENSE CHARGED.—Notwithstanding the propriety of evidence of other crimes, as connected with the offense charged, the court properly instructed the jury that they should not convict unless convinced of defendant's guilt from the evidence of

the precise offense charged to a moral certainty and beyond a reasonable doubt.

ID.—IMPEACHMENT OF SUPERVISOR AS WITNESS—AFFIDAVIT IN REPLY TO CIVIL COMPLAINT—ADMISSION OF BOTH FOR LIMITED PURPOSE.— Where a supervisor had testified for the prosecution to a bribery of himself by defendant's agent, and it appeared that in reply to a complaint by the district attorney, whom such agent as acting mayor had assumed to remove and to appoint defendant as district attorney in his stead, to enjoin defendant from assuming the office, which charged that defendant through such agent had bribed the supervisors, such witness had made an affidavit that he had committed no crime of any kind, such affidavit and the complaint to which it was in reply, which was necessary to explain the same, were properly admitted in evidence for the limited purpose of impeaching such witness.

ID.—PRESUMPTION OF PROPER UNDERSTANDING BY JURY—INSTRUCTION.— It must be presumed that the jury, as intelligent men, understood that both the affidavit and the complaint were admitted in evidence solely for the limited purpose of impeaching the witness and for no other purpose, especially where the court instructed them as to the effect of evidence received for a limited purpose.

ID.—EVIDENCE—SHOOTING OF ASSISTANT DISTRICT ATTORNEY BY CHALLENGED JUROR—PUBLIC EXCITEMENT—SUICIDE—PROPER REFUSAL TO DISMISS JURY.—Upon the shooting of the assistant district attorney by a challenged juror, who afterward committed suicide, and the consequent public excitement in which defendant was blamed, of which it does not appear that the jury had any knowledge, it cannot be said that the court abused its discretion in refusing to discharge the jury and to impanel another jury to try the case.

ID.—INSTRUCTION AS TO SHOOTING.—The court properly stated the facts of the shooting to the jury and instructed them that "that transaction, as far as the court and the jury, the defendant at the bar, the people of the state of California, the counsel and all others interested or involved in this trial are concerned, is to stand as though it had not occurred," and that "it should not in any manner form anything in the nature of bias or prejudice concerning anyone."

ID.—ABSENCE OF PROOF OF PREJUDICE.—It is held that there is nothing to show in the remotest degree that defendant was in any way connected with the shooting, or that any juror had become biased or prejudiced against the defendant by reason of the shooting, and that the jurors were not at large, but were at all times kept in the charge of the sheriff.

ID.—PROPER DENIAL OF PERMISSION TO EXAMINE JURORS UNDER OATH.— The court properly denied permission to the defendant to examine the several jurors under oath, in order to ascertain whether they had been biased or prejudiced by the shooting.

ID.—MOTION FOR NEW TRIAL—HEARSAY AFFIDAVITS AS TO BIAS FROM
SHOOTING.—Hearsay affidavits on motion for a new trial, in refer-
ence to bias as the result of the shooting, are not sufficient to im-
peach the verdict.

ID.—SWORN JUROR CANNOT DISQUALIFY HIMSELF BY STATEMENT TO
JUDGE.—A juror sworn to try the case cannot, by going to the judge
to make a statement, disqualify himself from the duty to try the
case according to the evidence.

ID.—ABSTRACT READING OF SECTION 1323 OF CODE NOT PREJUDICIAL—
CORRECT INSTRUCTIONS AS TO FAILURE OF DEFENDANT TO TESTIFY.—
The abstract reading of section 1320 of the Penal Code to the jury
could not prejudice the defendant, or constitute error, where the
court fully instructed the jury as to the right of the defendant to
refrain from testifying, and that no inference could be indulged in
against him on account of said failure to testify, and as to the
presumption of innocence attending him throughout the trial until
proved guilty to a moral certainty and beyond any reasonable doubt.

ID.—WILLFUL SUPPRESSION OF EVIDENCE—PRESUMPTION OF ADVERSE
CHARACTER—REQUEST OF DEFENDANT.—Where the defendant re-
quested an instruction as to the presumption stated in section 2661
of the Code of Civil Procedure, "that evidence willfully suppressed
would be adverse, if produced," to be applied to the prosecution's
failure to call three ex-supervisors as witnesses, the defendant cannot
complain that the court read that section to the jury, where it could
have no application to the defendant.

ID.—APPLICABLE INSTRUCTION MAY FOLLOW LANGUAGE OF CODE.—Where
an occasion is proper for the giving of an instruction embodied in
the code, it can be given in no better form than as laid down in the
code.

ID.—SPECIFIC INSTRUCTIONS ON MATERIAL QUESTIONS—READING OF CODE
PROVISIONS HARMLESS.—Where the court gave specific instructions
on all material questions, the reading of code provisions is harmless.

ID.—INSTRUCTIONS AS TO ACCOMPLICES—PROPER REFUSAL OF REQUEST.—
The court properly instructed the jury that "one who offers a bribe
is not for that reason alone an accomplice of the one to whom it is
offered; and one to whom the bribe is offered or who asks or receives
a bribe is not for that reason alone an accomplice of one who offers
a bribe," and properly refused an instruction that the supervisor
to whom the bribe was offered was in fact an accomplice, if he was
a party to a general scheme to deal in franchises to be granted by
the supervisors for money.

ID.—NATURE OF "ACCOMPLICE"—PARTICULAR OFFENSE CHARGED—OFFER
OF BRIBE.—The word "accomplice," as used in the statute, means an
accomplice in the commission of the offense charged and which is
under investigation, which is an offer by defendant to bribe Super-
visor Furey. He could not be an accomplice in the offer to bribe
himself. There is no evidence that he entered into a combination

or conspiracy with defendant and other supervisors to offer a bribe to himself.

ID.—SCHEME OF DEALS FOR FRANCHISES TO BE GRANTED BY SUPERVISORS—DISTINCT OFFENSE NOT CHARGED.—The scheme for deals for franchises to be granted by the supervisors for money would render all parties entering such scheme accomplices, but they would be accomplices to a distinct offense from that charged, and which is not named in the indictment.

ID.—EVIDENCE—CONNECTION OF DEFENDANT WITH OFFER—TESTIMONY OF ACCOMPLICES OF DEFENDANT—CORROBORATION—SUFFICIENT EVIDENCE.—Where the supervisor to whom the bribe was offered dealt alone with Supervisor Gallagher and did not know defendant in the transaction, it became necessary to connect defendant therewith by witnesses, who were accomplices with defendant in the deal in which the offer was made, and their testimony against the defendant required corroboration tending to connect defendant with the commission of the crime charged. It is held that there is corroborative evidence sufficient for that purpose and to show that Gallagher was the agent and mouthpiece of the defendant in making the offer.

ID.—ARGUMENT OF DISTRICT ATTORNEY—FAILURE OF DEFENDANT TO CALL WITNESS WHO HANDLED MONEY USED—ABSENCE OF MISCONDUCT.— It was not misconduct for the district attorney to comment in his argument upon the failure of defendant to call the attorney for the United Railroads, who handled the money used in obtaining the franchise, to show that the transaction was honest and fair, or to explain the nature thereof.

ID.—IMPROPER REMARKS—CURE BY RULING OF COURT.—It is held that in so far as improper remarks of the district attorney might be injurious, they were promptly cured by the rulings of the court, and that they are not of sufficient importance to call for a reversal of the case.

ID.—DUTY OF DEFENDANT'S COUNSEL.—It is but fair to require the defendant's counsel, in the case of improper remarks by the district attorney, to call the court's attention to them then and there, and invoke the aid of the court to prevent them from injuring the defendant, before he will be allowed to urge the matter as error in this court.

ID.—SUFFICIENCY OF INDICTMENT—PETITION FOR REHEARING—QUESTION NOT RAISED.—A rehearing will not be granted to determine the sufficiency of the indictment, which was not raised in the briefs on file when the decision was rendered.

### STATEMENT AND DECISION IN BANK.

(February 28, 1911.)

PRACTICE OF SUPREME COURT—HEARING IN BANK AFTER DECISION IN COURT OF APPEAL—CONSULTATION OF JUSTICES.—Where applications are made before the supreme court for a hearing in bank after

the decision by the district court of appeal, the uniform practice has been for the justices of the supreme court to meet in consultation for their consideration.

ID.—JOINT CONCURRENCE OF FOUR JUSTICES ESSENTIAL.—The joint action or concurrence of four justices is essential to constitute the action of the supreme court.

ID.—LIMIT OF TIME FOR MAKING ORDER—FINAL DECISION.—The expiration of thirty days after the decision of the district court of appeal has become final, without making a valid order in the supreme court, ends its power in that regard, and renders the decision of the district court of appeal final for all purposes.

ID.—EFFECT OF ABSENCE OF JUSTICE FROM STATE—FUNCTIONS OF OFFICE SUSPENDED—ACTION WHILE ABSENT A NULLITY.—A judicial officer must exercise his judicial power within the territorial limits of his jurisdiction, and any attempted exercise of his power while without such territorial limits is, in the absence of an express law authorizing the same, a nullity. The functions of a justice of this court while absent from the state become temporarily vacant.

ID.—PURPORTED ORDER CONCURRED IN BY ABSENT JUSTICE AND ONLY THREE PRESENT JUSTICES VACATED.—A purported order of the supreme court granting a hearing in bank after decision in the district court of appeal, concurred in by a justice who was absent from the state and by only three justices present in the state, is void and must be vacated.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco, and from an order denying a new trial. Wm. P. Lawlor, Judge.

The facts are stated in the opinion of the district court of appeal, and in the opinion of the supreme court in bank.

Henry Ach, Thomas P. Dozier, C. W. Cross, J. J. West, and Albert Fink, for Appellant.

W. H. Metson, D. J. Murphy, Frank C. Drew, and Chas. A. Garter, *amici curiae*, for Appellant, on petition for rehearing. W. H. H. Hart, *amicus curiae*.

U. S. Webb, Attorney General, and John O'Gara, for Respondent.

COOPER, P. J.—The defendant was indicted by the grand jury for the crime of offering a bribe, to wit, $4,000, to John J. Furey, a supervisor of the city and county of San Fran-

cisco, with the corrupt intent to influence the official action of said supervisor in the matter of granting a franchise to the United Railroads of San Francisco, a corporation, to operate and maintain its street-cars by means of an overhead trolley electric system, instead of the underground cable which it had been using.

No question is raised as to the sufficiency of the indictment.

The trial commenced August 27, 1908, and continued thereafter until December 10, 1908, at which time the jury returned a verdict finding the defendant guilty as charged.

He made a motion for a new trial and also a motion in arrest of judgment, both of which motions were denied, and he was thereafter sentenced to a term of fourteen years in the state prison at San Quentin. This appeal is prosecuted from the judgment and from the order so made.

Counsel have seen fit to. bring up the whole record, including the testimony in full by question and answer, together with the arguments of counsel on questions of law during the trial, and the rulings thereon, the full and complete examination of the jurors in the impanelment of the jury, and even the argument of counsel as made to the jury. The record consists of twenty-four bound volumes, containing over twelve thousand printed pages, and there are ten volumes of briefs, aggregating some two thousand eight hundred printed pages. We have never before known of such a record being presented to an appellate court. The examination of the record and of the many points raised has been a Herculean task, and such as the law never contemplated being imposed upon an appellate court, whose function is to pass upon questions of law. We have, however, performed the task as fully as our strength, time and endurance would permit, and have passed upon apparently the most plausible and material points urged by the appellant to the best of our ability. If we were to discuss minutely every point raised, this opinion would fill a volume in the Reports and be protracted to an unreasonable length.

1. It is claimed that the evidence is insufficient to support the verdict. In the discussion of this question it must be borne in mind that we have the power only as a matter of law to say as to whether or not there is sufficient evidence, conceding every syllable of it to be true, to support the ulti-

mate finding of the jury. The jury is the sole judge of all questions of fact, and its finding, based upon evidence, upon any controverted question is conclusive on this court. It has the right to believe or to disbelieve any witness, and draw all reasonable inferences from the facts proven.

The question, and the sole question, for the jury in this case was as to whether or not the defendant offered a bribe to Furey as charged in the indictment. All the testimony offered at the long and protracted trial was for the sole purpose of solving this one question. The direct evidence of the offer was that of Gallagher, Wilson and Furey, each of whom were supervisors at the time the offer is said to have been made.

Gallagher testified that he made the offer to Furey, and that he was authorized by the defendant to make such offer. It is urged that in cross-examination Gallagher destroyed the effect of his testimony by admitting that the statement as to the offer to Furey was "his best recollection"; but upon a careful reading of this testimony we conclude that while his evidence may have been weakened by the qualifications as to his best recollection, yet it was not destroyed to such an extent that we can say that the jury had no right to believe it. In fact the qualification as to the best recollection of the witness appears in his cross-examination. Gallagher testified in direct examination: "The next matter that Ruef spoke to me about was the matter of the permit for the United Railroads to use electricity on its lines of railroad in this city and county. No one was present. It was perhaps a week before the fire of April 18, 1906. He said the United Railroads wanted to get a permit to use electricity on their lines, asked me to speak to the members of the board about it, and let him know whether it could be done, whether it could go through the board, and what amount of money it would take. I told him that I would do so, but I had not spoken to any of the members previous to the fire.

"Q. With whom did you speak? A. I spoke to Wilson, Coleman, Boxton, Davis, Mamlock and Furey. I spoke to other members, but I don't recall which other ones at this time. . . .

"Q. When and where did your conversation with Furey take place, and who, if anyone, was present? A. There was

no one present. The conversation took place within a few days after my conversation with Ruef. I cannot fix the place any more definitely than that it was upon the streets of this city and county.

"Q. State what was said by each of you upon that occasion upon that subject? A. I said to him that the United Railroads wanted to secure a permit to use electricity on their lines, and asked him if he would stand favorable. He said he would.

"Q. Did you have any further conversation with Ruef on that subject after the conversations which you have just related with these supervisors? A. I saw Ruef and had a conversation with him. I said to Ruef that I thought the proposition could be put through, or words to that effect. Ruef said he would allow the sum of $4,000 to each of the supervisors on that trolley matter proposition, in the United Railroads permit matter. He asked me to see the members about it, see if that would be satisfactory, and I told him I would do so. That is the substance of the conversation. . . .

"Q. When and where did your conversation with Furey on that subject take place, and who, if anyone, was present? A. My conversation with Furey took place at the meeting rooms of the board according to my remembrance, my best recollection. There was no one else present. It was within a few days after my conversation with Ruef.

"Q. State what was said by each of you on that occasion. A. I stated to him there would be $4,000 in the United Railroads trolley matter. He said it would be all right. That is the substance of the conversation."

In cross-examination, after he had been several days on the witness-stand, and after having been asked and having answered hundreds of questions, he was asked by counsel for the defendant and answered as follows:

"Q. You are absolutely positive you spoke to Furey, are you not? A. My best recollection is that I spoke to Furey, but I would not be willing to say that there could not be a mistake about it. . . .

"Q. How much of a qualification is there now in your statement as to John J. Furey when you say that it is according to your best recollection, that you cannot be positive about it? A. My remembrance is that I spoke to Furey about it,

but I would not be willing to say that there is no possibility of my being in error about it.

"Q. You are positive, now, are you? A. I would not *  ,am so positive as to say there could not possibly be  uestion about it."

will be noticed that Gallagher nowhere and at no place expressed any doubt, or any best recollection, as to the fact that he was authorized by defendant to make the offer, and that he did talk with various members of the board of supervisors as to the offer and as to the amount to be paid to each supervisor. His testimony in this respect is direct and unequivocal, and it is only when questioned in cross-examination about the particular supervisor, Furey, that he uses the words "according to my best recollection." In view of the testimony of Furey the qualification by Gallagher of his testimony in chief does not appear to be essentially material. Furey testified without any hesitation on the subject. His testimony is as follows:

"Q. Do you remember, Mr. Furey, of the passage of the overhead trolley ordinance in the board of supervisors in the month of May, 1906? A. I do.

"Q. Were you present when the matter first came up in board on May 14, 1906? A. I believe I was, yes.

"Q. Now, Mr. Furey, before that matter came up in board, had you any conversation with any person in relation to the passage of that ordinance by the board at which anything was said about the action of the board? A. Yes, sir.

"Q. With whom had you any such conversation? A. James L. Gallagher.

"Q. How many such conversations did you have? A. My best recollection is I had three.

"Q. Where did those conversations take place? A. In Mowry's Hall.

"Q. Did these conversations take place after the fire? A. Yes, sir. . . .

"Q. Now, Mr. Furey, about how long before the matter was brought up in board did Mr. Gallagher first speak to you about that trolley matter? A. About a week or ten days, something like that. . . .

"Q. What did he say to you at this first conversation? A. He told me that the program was that the trolley be

granted, that the trolley franchise be granted to the Market Street Railway Company as a trolley line. That is the substance of it. That is possibly not the exact words.

"Q. What, if anything, did you say to him at that time in that conversation? A. I said, 'All right. I will stand for it.' . . .

"Q. How long afterward did you have your next conversation with Mr. Gallagher on that matter? A. I am not positive as to the time; some little time afterward.

"Q. Well, give the best recollection that you have as to the time. How many days? A. It possibly might have been a week.

"Q. At that second conversation what, if anything, was said by James L. Gallagher to you, and by you to him, in relation to the trolley matter? A. He told me there was $8,000 or $10,000 in it.

"Q. What, if anything, did you say to him? A. I said, 'All right; I would stand program.'

"Q. At your third conversation with James L. Gallagher what, if anything, did he say to you, and what, if anything, did you say to him? A. He said it was brought down to $4,000.

"Q. Can you give his exact words ·as he spoke them in that conversation? A. No, I cannot give his exact words.

"Q. Well, give the substance of his statement if you please. A. As I remember it he said, 'Furey, the trolley was brought down to $4,000.'

"Q. What, if anything, did you say in reply to James L. Gallagher then? A. I said, 'All right.' "

Wilson corroborated the testimony of Furey on the same point. He was asked:

"Q. Do you now recall the conversation which you had with Furey before the vote on the passage to print of the trolley permit ordinance? A. Yes, sir.

"Q. How long before the actual passage to print did that conversation take place? A. Before the board went into session, about 2 o'clock in the afternoon.

"Q. About 2 o'clock in the afternoon? A. Yes, sir.

"Q. Of what day? A. May 14th. . . .

"Q. State whether or not Mr. Ruef was present at the board rooms that day before the passage to print of that ordinance. A. Yes, sir.

"Q. Now, what did Furey tell you on that day before the passage to print of the ordinance, in relation to the trolley ordinance? A. He said that Gallagher had told him that there was $4,000 in it. 'Is that right?' I told him that I hadn't had a talk with Mr. Gallagher yet; I would see; I would let him know.

"Q. And did you see him? A. I had a talk with Mr. Gallagher, and then I told him that the trolley matter was all right.

"Q. How long after you had the talk with Furey did you have the talk with Gallagher? A. About an hour."

There is other evidence in corroboration of the testimony of the three supervisors tending to connect the defendant with the commission of the offense. There is evidence that $200,000 was placed at the United States Mint in the city and county of San Francisco to the credit of the president of the United Railroads; that Cole, the cashier of the Mint, at the request of the attorney for the United Railroads, exchanged the gold to the extent of $50,000 for that amount of currency from the Relief Fund, of which Cole was also treasurer; that Gallagher, as agent of and acting under the instructions of defendant, came into possession of $85,000, of which sum he paid to Wilson $10,000, and the other supervisors $4,000 each, and retained $15,000 himself for his special services in negotiating with the other supervisors; that while the ordinance granting the permit was pending defendant said, in speaking of the matter, in the presence of W. W. Sanderson and others, that "This thing will go through on Monday. It is all settled"; that on the same day the money was received from the Mint by the officers of the United Railroads, defendant hired a new safe deposit box of large dimensions at the vaults of the Western National Bank, where he already had two such boxes; that he was driven back and forth from the offices of the United Railroads to the Western National Bank about the time and while the money was being transferred to him, and that Wilson deposited $5,000 of the money received by him with the California Safe Deposit and Trust Company, as shown by a deposit tag produced

from the files of said bank, on the day he received the money; that caucuses were held before each regular meeting of the board of supervisors at which defendant was always present; that various other matters had been put through and passed by the board of supervisors at defendant's dictation, for which various sums in each case were paid to the supervisors —among these being the prize fight ordinance, the Parkside franchise, the order fixing gas rates, the franchise for the Home Telephone Company; that defendant, upon hearing that some of the supervisors had been paid for their votes by an agent of the Pacific States Telephone Company without his knowledge, said to one Poheim, a physician: "They tried to take my supervisors away from me, but I fixed them. I would like to see one of them get away from me." That after these matters were attracting great public attention, and Langdon, the district attorney, was procuring evidence and preparing to prosecute the offenders, defendant had Gallagher, who was then acting mayor of San Francisco, make an order purporting to remove Langdon from the office of district attorney, and appointing himself as such district attorney.

There are many other facts and circumstances in evidence, but the above is sufficient to show that the supervisors were corroborated in regard to defendant's connection with the crime. These corroborating facts and circumstances all stand out as clear as the midday sun, with nothing to explain them or in any manner to free defendant from his connection therewith. While it is true that no one save Gallagher testified as to defendant's authorizing him to offer the bribe, there is evidence that defendant received $200,000; that he had it converted into currency; that he had the ordinance passed, and that Furey was one of the supervisors who voted for the ordinance. No one could reasonably draw any other inference from these facts than the one that Gallagher was the agent and mouthpiece of defendant.

In our opinion the evidence not only supports the verdict of the jury, but no other verdict could reasonably be justified.

We will now pass to the discussion of other questions, bearing in mind that where defendant has been found guilty upon a valid indictment, and the evidence supports the verdict, the court "must give judgment without regard to technical errors or defects or to exceptions which do not affect the substantial

rights of the parties.'' (Pen. Code, sec. 1258; *People* v. *Stokes*, 5 Cal. App. 205, [89 Pac. 997]; *People* v. *Hutchings*, 8 Cal. App. 550, [97 Pac. 325].) Of course, the defendant was entitled to a fair trial according to the law, and if anything occurred which deprived him of such fair trial we would not hesitate to reverse the judgment.

2. It is claimed that the court erred in denying defendant's challenges to several jurors. The volume of defendant's brief devoted to this subject is volume VII, and contains four hundred and ten printed pages. The proceedings on the impanelment of the jury take up six thousand six hundred pages of the printed transcript; hence it is apparent that we cannot discuss the several challenges in detail. The first, and a sample of all, is the challenge to the juror Arthur. Arthur testified on his *voir dire* that he had heard a great deal about the ''graft'' cases; that he had read the newspapers; that he had a general opinion that graft had been going on in San Francisco, and that money had been paid to the supervisors, but that the opinion was not so fixed and positive that he would act upon it, and that such opinion was founded upon newspaper accounts and upon public rumor; that he knew nothing personally of the facts of the case, nor had he talked with any witness in regard to it. In cross-examination the juror was asked and answered questions as follows:

''Q. Do you recall anybody ever reading to you from a newspaper or from anything else, a verbatim report of what purported to be the testimony taken before the grand jury by question and answer? A. Well, I could not say that I have, though I might have. I could not say that I ever heard anybody read it.

''Q. At the present time you have no recollection of having heard anyone read it? A. No.

''Q. You have no recollection of ever having read it yourself in that form? A. No, I have not.

''Q. Now, then, have you any information upon the subject of the trolley matter itself in any way to form any opinion in your mind other than the newspaper reading and general notoriety, common notoriety and general rumor? A. No, sir. . . .

''Q. Did you ever talk with any person about it who claimed to have any personal knowledge of the facts or any

of the facts in relation to the trolley matter? A. No, I have not.

"Q. Did you say you had an opinion or impression in regard to the trolley matter? A. I could not say you would call it an opinion or not. I suppose it must be an opinion.

"Q. Whatever it may be, whatever you may term it, if you were accepted as a juror could you set it to one side by will power alone, and prevent it from interfering in any way or influencing you in any way in your consideration of the testimony or your consideration of the case or reaching a conclusion in the case? A. I certainly could.

"Q. You don't feel that it is strong enough to give you any trouble to set it aside, or that it would put you to any trouble in trying this case solely on the sworn testimony produced here under the instructions of the court? A. No, sir, it would not be any trouble to set it aside. . . .

"Q. Have you any business interests that you know of that might in any way influence you to lean even ever so slightly either one way or the other in this case? A. No, sir. I don't allow anything of that kind, even if there was.

"Q. You have no personal feeling against Mr. Ruef? A. No, sir, I don't know the man. . . .

"Q. If you were selected as a juror in this case, the court will probably tell you that this defendant, Mr. Ruef, notwithstanding the fact that he is indicted, is presumed to be innocent of this offense, the offense charged being that he made an offer to John J. Furey of $4,000 in the trolley matter, and that the jury when selected are to presume him absolutely innocent of that crime, and that presumption is not a mere fiction or matter of form, but it is a substantial right —if the court so instructs you, and you are taken as a juror, do you think that you could start in and give Mr. Ruef, notwithstanding your present opinion, the full benefit of that presumption in its enlarged sense? A. I could.

"Q. And would you? A. I would. . . .

"Q. The mere fact that after hearing the testimony of any witness or any witnesses in this case that you did not believe what they said, or that their testimony coincided with your opinion, would that govern you at all in reaching a conclusion as to whether you believed the witness or not? A.

If I were selected as a juror I would not have any opinion. . . .

"Q. In that event you would not believe the testimony of the witness simply because your opinion might come back to you, and his statements be in accordance with your opinion, would you? A. I would not allow my opinion to come back to me.

"You would shut it out completely I understand? A. I certainly would. . . .

"Q. And you could do so, notwithstanding that the testimony of the accomplices was in line with what your opinion had formerly been, you could still view that testimony with distrust, could you? A. If I were selected as a juror the opinion I might have would not have anything to do with it.

"Q. I see. Because of that fact, notwithstanding the possibility that the testimony of the accomplices, if there be any such, should concur with the opinion that you did have, you could still view the testimony of the accomplices with distrust if the court instructed you that you should do so or ought to do so? A. I could."

Our Penal Code provides (section 1076) that "No person shall be disqualified as a juror by reason of having formed or expressed an opinion upon the matter or cause to be submitted to such jury founded upon public rumor, statements in public journals or common notoriety, provided it appear to the court, from his declaration, under oath or otherwise, that he can and will, notwithstanding such an opinion, act impartially and fairly upon the matters to be submitted to him." The opinion of the juror was beyond question founded upon public rumor, statements in public journals and common notoriety; and in such case it is the province of the trial court to pass upon and examine the question as to whether or not a juror can and will, notwithstanding such opinion, act impartially and fairly upon the matter to be submitted to him; and where the trial court has heard the evidence and observed the juror as he gave his answers every presumption is in favor of the finding of the court. It is only in cases of palpable abuse of discretion that this court will interfere. The finding of the trial court is like the finding upon any question of fact within its function. It was said by the supreme court in *People* v. *Fredericks*, 106 Cal. 559, [39 Pac.

945] : "This court is only allowed to review an order denying a challenge to the juror on the ground of actual bias when the evidence upon the examination of the juror is so opposed to the decision of the trial court that the question becomes one of law; for it is only upon questions of law that this court has appellate jurisdiction in criminal cases." To the same effect are *People* v. *Scott,* 123 Cal. 434, [56 Pac. 102] ; *People* v. *Sowell,* 145 Cal. 300, [78 Pac. 717] ; *People* v. *Ryan,* 152 Cal. 371, [92 Pac. 853].

Much stress is laid upon the fact that the juror stated that he had read in the papers statements purporting to be the testimony of witnesses before the grand jury, and perhaps in the form of questions and answers in some cases. We are asked to hold that in such case the publication of the evidence is more than a statement in a public journal; but if we should so hold it would be in effect to make that a disqualification of a juror which is not made so by the statute. In these days of modern journalism the newspapers publish everything, particularly in regard to criminal cases of great notoriety or involving some private scandal that will furnish food for the eager multitude. To hold that the publication of the evidence of witnesses, given before a grand jury or a committing magistrate, by question and answer, by an enterprising public journal would disqualify a juror who had formed or expressed some kind of an opinion upon it, notwithstanding it was clearly made to appear that he could and would, notwithstanding such opinion, act impartially and fairly, would in many cases make it almost impossible to procure a jury. All intelligent people read public journals, at least to some extent; and no intelligent man can read the statements concerning the commission of a crime of great notoriety, or even hear the general public talk about such crime, without forming, and in many cases also expressing, an opinion about it. But in most cases jurors are honest in their intentions to do what is right; and if they are intelligent and fit to be jurors they will discard any opinion that they may have as to the merits of the case when such opinion is not based upon knowledge of some fact, or where their minds are not so biased by the facts as to disqualify them. Of course the trial court in such case should use the utmost caution to see that

14 Cal. App.—38

no juror, who has such an opinion or prejudice that he cannot act impartially and fairly, should sit upon the jury; but no reasonable thinking man can help having to some extent formed an opinion. Even the judge himself has such opinion, and often a very positive one, but he is not for this reason disqualified to sit in the case. If the trial judge is, from the examination of the juror, or other evidence, doubtful as to whether or not the juror can and will discard his opinion, and fairly and impartially try the case, he should resolve such doubt against the juror and excuse him. This is the safe rule; and if followed would save much trouble and grave questions before the courts of appeal. But we hold that the mere reading of what purports to be the evidence, even by question and answer, as published in some public journal, does not of itself disqualify a juror, and it has been so held. (*People* v. *Irwin*, 77 Cal. 494, [20 Pac. 56]; *Hopt* v. *Utah*, 120 U. S. 430, [7 Sup. Ct. Rep. 614, 30 L. Ed. 708].) In the latter case it was said by Judge Field: ''We think that evidence, or what purports to be evidence, printed in a newspaper are statements in a public journal within the meaning of the statute, and that the judgment of the court upon the opinion of the juror in such cases is conclusive.''

Defendant relies upon *People* v. *Helm*, 152 Cal. 532, [93 Pac. 99], in support of his contention that the juror is disqualified. We have no fault to find with that case. In fact it was considered by this court and cited with approval in *People* v. *Schmitz*, 7 Cal. App. 350, [94 Pac. 107, 15 L. R. A., N. S., 717], and it is not in conflict with what we have said in this case. The court there simply held that the opinion of the juror must be based upon one or all of the matters enumerated in section 1076 of the Penal Code, or he would be disqualified. A sample of the evidence of the jurors who were disqualified and passed by the trial court in that case is that of the juror Neeley, who testified: ''I do not believe I could act as fairly and impartially in this case if selected as a juryman as I could in a case where I have never heard anything about. The little impression that I have would bob up until all the evidence was in. I think that opinion or impression that I have would crop up in my consideration of the case.'' And we might add that of the juror Winters, who testified: ''If selected as a juryman I would possibly

require the prosecution to convince me beyond a reasonable doubt of the guilt of the defendant. In my present state of mind it would not require as much evidence to convince me of the guilt of this defendant in this case as it would where I had never heard anything about the facts and circumstances. It might require more evidence on the part of the defense to prove the young man innocent than it would be in a case that I had never heard anything about.''

What we have said in regard to the ruling on the challenge to the juror Arthur applies to rulings of the same character as to the other jurors. Under the rule as we understand it we cannot disturb the finding of the trial court as to the qualifications of any one of them.

3. During the examination of the juror Arthur the attorney for the defendant asked permission to and did call Assistant District Attorney Heney to the witness-stand for the purpose of eliciting information concerning said juror. Heney was asked as to whether or not he had in his possession a report made by an agent or employee of the district attorney's office as to an alleged interview with the juror, or concerning the state of mind or opinion of the juror regarding the case. It appeared by the answer of the witness that he had a report as to the juror Arthur as to his qualifications as such juror. The court, upon objection being made by the assistant district attorney, refused to compel him to show the report to the attorney for the defendant or to divulge its contents. Such ruling is now claimed to be erroneous.

There is nothing in the record in any manner showing the contents of the report or who it was made by. It was at most hearsay, and the attempt to get at its contents was in the nature of a ''fishing'' expedition, as it does not appear that the defendant's attorney had any knowledge of its contents, nor is it clear as to the object of counsel in endeavoring to get a view of it. The district attorney is an officer of the court, and in the prosecution of a defendant charged with crime he should be fair, and only seek a conviction by legal means and through a fair and impartial jury. A district attorney who would willfully endeavor to pack a jury, or endeavor to get upon it men who are biased against the defendant to such an extent as to make them unfair jurors under the law, should not be permitted to conduct the case,

and in fact should not be entitled to practice in a court of justice. But in this case we must presume in favor of the officer as performing his official duty. While the district attorney should always be fair, and use only legal means to secure a conviction, yet he is the attorney for the people. We know of no law or principle which requires him to divulge to his adversary the private information he has, either in the way of evidence or information concerning jurors. It is the province of the district attorney, and also of the attorney for the defendant, in a criminal case to find out all he can in a legitimate way as to the character, standing and integrity of the several jurors. Of course after a juror has been summoned, and is in contemplation of law at least in attendance upon the court, no interview of a juror or tampering with him outside of the courtroom should for a moment be tolerated, no matter which side attempts it. The examination of the juror and all questions put to him should be in open court in the presence of all parties and of the judge. In this case the information, if any, in the possession of the district attorney may have been of a confidential nature, and such as it was entirely proper for him to have. It may have contained a statement that the juror was and always had been an upright law-abiding citizen, and that he would do his duty fearlessly. It may have contained information as to whether or not the district attorney intended to peremptorily challenge the juror, and thus have been of much advantage to the defendant. While a defendant in a criminal case is guaranteed a fair trial by an impartial jury, and while he is given the right to peremptorily challenge twice as many jurors as the prosecution, we have never heard of that right being extended so as to give him access to the district attorney's memoranda, papers or documents until they are legally produced in court. In any event, we cannot hold that it was reversible error for the court to refuse to compel the district attorney to show to the attorney for the defendant a paper the contents of which, so far as the record is concerned, is a matter of mere conjecture. Defendant's counsel did not attempt to find the name of the person who had made the report, or to bring such person into court for examination. If this had been done, or if it had transpired in the course of the examination of the witness, that such witness had made a

report or statement in writing concerning the same matter, the court, if it appeared necessary, no doubt would have compelled the production of the writing in aid of getting the entire truth from the witness. But such is not this case. It was merely an attempt to get a paper from the possession of the district attorney, the contents of which the defendant's attorney knew nothing about.

4. Counsel for the defendant have devoted volume II of their brief, containing five hundred and forty-one pages, to the subject of alleged misconduct of the judge during the course of the trial, claiming that the judge was not only biased and prejudiced against the defendant, but that he had made certain injurious remarks during the course of the trial as to the credibility of witnesses, and in disparagement of defendant's counsel.

One of the most objectionable matters in the opinion of counsel is certain remarks made while defendant's counsel was cross-examining the witness Gallagher. The direct examination of Gallagher occupied about three and one-half days, and his cross-examination twice as long. The most minute details as to other transactions, evidence in other cases, and evidence given before the grand jury, were subjects which occupied not only hours but days in cross-examination. It is evident in such case that the patience of the jurors and of the trial judge must have been put to a severe test. After counsel for the defendant had asked Gallagher many questions as to why he answered promptly and positively on direct examination, and as to why it was that upon cross-examination on several occasions he hesitated and said "according to my best recollection," and after controversies in which the counsel on each side and the judge took part, counsel for defendant said: "The question is this—let me get away from these things —I asked a question of the witness concerning a subject matter he has testified to upon direct examination without qualification at all, and we will say, without hesitation, I asked the question and waited five or ten seconds, and he does not answer. Haven't I a right to ask the question why he hesitates?

"The Court: I don't think you have, if the witness is apparently engaged in an effort to collect his thoughts and render a proper answer. Every man has temperamental qualities.

You have yours, and the witness has his. It may be possible for you to make a quick, satisfactory response to every question propounded to you. Another witness may not be so gifted, or his mind may be so filled with a recollection of events that he owes it to himself and to the interests of truth to answer prudently and carefully.''

After exception taken by counsel to this remark, the court said: ''I will lay down a rule for you in that regard so you will know exactly where you stand. When you propound a question to the witness you must wait until he answers. When he has answered, if there is anything about his hesitancy in answering it, you may take that up as a special subject of inquiry.

''Mr. Ach: I will adopt that course. . . . If the court gets the idea I am insulting the witness, or attempting to insult the witness, the court can fine or imprison me for contempt.

''Mr. Heney: Your honor stopped me a number of times on Mr. Ach's suggestion because my tone of voice was a little loud.

''Mr. Ach: No, your honor.

''The Court: We will perhaps advance with more celerity if there is less of this side discussion. I think I understand the prerogatives of the court in dealing with witnesses and kindred matters. · No counsel has any right to assume a harsh demeanor toward any witness. The statute law of this state expressly protects or seeks to protect a witness in that behalf. He has no right to use insulting language; he has no right— neither the court nor counsel have any right—to detain a witness on the stand longer than the interests of justice seem to require. A witness has rights, and they must be respected. I shall see that the rights of every witness produced here are respected.''

The court, during another controversy while this witness was being cross-examined, remarked that the frequent interruptions and exceptions to the remarks of the court were ''well calculated to undermine the administration of justice.''

The above remarks were evidently addressed to counsel during the progress of the trial; and while parts of them might well have been omitted and are not to be commended, we do not think that they were injurious to defendant. The remark by the court that every man has temperamental qual-

ities is a commonplace and self-evident proposition. It was
known to every juror before it was uttered by the court.
And so of the statement that the witness owed it to himself
and the interests of truth to answer prudently and carefully.
We do not think that by the remarks the judge expressed
his opinion to the effect that Gallagher was a credible wit-
ness. The language complained of was addressed to counsel
and not to the jury, and was merely intended to explain the
reasons why the judge made the rulings. In such case the
remarks were not a charge to the jury with respect to mat-
ters of fact. (*People* v. *McLean,* 84 Cal. 483, [24 Pac. 32] ;
*Reed* v. *Clark,* 47 Cal. 200.) In the latter case it was said:
"It is not unusual or improper for the judge, in passing upon
such a question, to announce for the guidance and benefit. of
counsel, the reasons which control him in the admission or
rejection of proffered evidence. This necessarily involves an
expression of opinion upon the evidence already introduced;
but this expression is not addressed to the jury nor intended
for their guidance, as is an instruction given at the request
of counsel or by the court upon its own motion, and which
it is the duty of the jury to follow strictly and without ques-
tioning."

The court in this case instructed the jury: "The court
charges you that you are not to use in the consideration or de-
termination of any fact in the case any reference to or com-
ment on the evidence which may have been made by the court
in connection with the admission of testimony or otherwise.
The determination of the facts of the case is solely within
your province, and you are not to be assisted or influenced
in any way by anything which the court may state or do in
that behalf except as to matters of law applicable thereto."
Under our system the trial judge should be careful to refrain
from making any comment upon the credibility of a witness,
or in excuse of his manner of testifying, or in disparagement
of counsel; but as we have said before this court would not
be justified in reversing a case for light or trivial reasons,
but should examine the whole record in determining as to
whether or not the defendant has been injured. Taking this
view of the matter we cannot say that it appears that the
judge willfully attempted to credit or discredit any witness,
or that he willfully cast discredit upon counsel. As the re-

marks were made to counsel at the time the rulings were made, and the court expressly instructed the jury they were not to consider any reference to or comment made by the court in connection with the admission of the testimony or otherwise, we do not think, upon the application of the practical principles which govern courts of appeal that we would be justified in holding them to have been prejudicial to defendant.

5. It is insisted that the court erred in the admission of evidence as to other and independent crimes committed by defendant. The various assignments of error in this regard may all be considered under the one general head.

The evidence was in substance that after the election of the board of supervisors which went into office in January, 1906, defendant had control of them; that he called Gallagher into his confidence telling him in effect that there would be "deals" coming up, and that he desired Gallagher to act as his representative with the other members of the board. That in pursuance of this plan the prize-fight ordinance was put through, for which the defendant paid $500 to each of the supervisors; the gas rate ordinance, for which he paid each supervisor $750, and the Home Telephone Company ordinance, for which he paid the board $62,500, which was distributed in different amounts among the board according to his view of their respective merits or demerits. In each of these matters the money came directly from defendant and was paid to Gallagher. In each case the "deal" was with the same board of supervisors, which was controlled by defendant. In each case the defendant attended the caucuses held by the board on Saturday night prior to the regular meeting. In each case the crime was the same as in this case, the paying of money to the same supervisors to influence their official action. In other words, to sum up, the evidence shows that the defendant was the "boss" in control of the board of supervisors; that no franchises or matters of importance could be put through the board except by "seeing defendant"; that the board of supervisors was referred to by defendant as "my supervisors."

Did this evidence logically tend to show that defendant, through the same channel, Gallagher, offered to bribe one of the same board of supervisors? Defendant, by his plea of

"not guilty," had denied that he offered to bribe Furey.   He
claimed, and now claims, that the testimony of Gallagher is
not corroborated by other evidence tending to connect him
with the commission of the offense.   Did not the fact that
defendant was in control of the board of supervisors; that
he had been in the habit, we might say, of paying them money
through Gallagher, naturally and logically tend to corroborate
Gallagher's statement that he was authorized by Ruef to
make the offer to Furey?   A general plan has been shown,
and Gallagher was the confidential agent.   The plan had
been in operation and was being continued, and the authority
of the agent had not been revoked.   The general rule, which
is founded upon reason and justice, forbids the introduction
of evidence which will tend to show that the accused had com-
mitted any other crime wholly independent of that for which
he is on trial; but the rule does not apply when the other
offenses are not wholly independent of the crime for which
the prisoner is on trial.   The rule is that where several crimes
are connected as part of one scheme or plan, all of the same
general character, and tending to the same common end, they
may be given in evidence to show the process or motive and
design leading up to the particular crime for which the pris-
oner is being tried, and thus directly tending to show logically
that the crime in question was a part of such common scheme.
If the several crimes are part of a chain of cause and con-
sequence so linked as to be necessarily connected with the
system or general plan, they are admissible.   In a case cited
by Lord Ellenborough in *Rex* v. *Whiley*, 2 Lea, 985, 1 New
Rep. 92, where a man had committed three burglaries in one
night, and stole a shirt at one place and left it at another,
they were all so connected that the court heard testimony of
all three burglaries, Lord Ellenborough remarked: "If crimes
did so intermix, the court must go through the detail."   In
an indictment for obtaining goods by false pretenses it is
allowable to prove that the same pretenses were used to an-
other.   (*Collins' Case*, 4 Rog. Rec. 143.)   So, on an indict-
ment for obtaining money under false pretenses, evidence of
obtaining money at other times from other parties by similar
pretenses was held admissible.   (*Strong* v. *State*, 56 Ind.
206.)   On the trial of a criminal prosecution, where the facts
and circumstances offered in evidence amount to proof of a

crime other than that charged, and there is ground to believe that the crime grew out of it, such facts and circumstances may be admitted to show the *quo animo* of the accused. (*Commonwealth* v. *Ferrigan,* 44 Pa. 386.)

In *People* v. *Cunningham,* 66 Cal. 669, [6 Pac. 701], where defendant, accused of larceny, had shown that he acquired certain cattle properly, it was held admissible for the prosecution to prove that another steer, belonging to a third person, was found in defendant's possession with the cattle of the complaining witness. In that case the remarks of Brockenborough, J., in *Walker* v. *Commonwealth,* 1 Leigh (Va.), 574, are quoted with approval: "It frequently happens that as the evidence of circumstances must be resorted to for the purpose of proving the commission of the particular offense charged, the proof of those circumstances involves the proof of other acts, either criminal or apparently innocent. In such case it is proper that the chain of evidence should be unbroken. If one or more links of that chain consist of circumstances which tend to prove the prisoner has been guilty of other crimes than that charged, this is no reason why the court should exclude those circumstances. They are so intimately connected and blended with the main facts adduced in evidence that they cannot be departed from with propriety; and there is no reason why the criminality of such intimately connected circumstances should exclude them more than other facts apparently innocent." (See, further, *People* v. *Rogers,* 71 Cal. 565, [12 Pac. 679]; *People* v. *McGilver,* 67 Cal. 55, [7 Pac. 49]; *People* v. *Ebanks,* 117 Cal. 652, [49 Pac. 1049, 40 L. R. A. 269]; Underhill on Criminal Evidence, sec. 88; 1 Roscoe's Criminal Evidence, 93; *Guthrie* v. *State,* 16 Neb. 667, [21 N. W. 455].) In the latter case the defendant was charged with the commission of bribery, and on appeal it was urged that the court committed error in permitting the state to prove other and distinct acts of bribery; but the court held the evidence competent, and in the opinion said: "It is clearly shown that the agreement was a continuing one, and contemplated a system of payments to be made in the future, and for which the same course was to be pursued by plaintiff in error as for the $300. It was known by plaintiff in error when Branch received money and no gambling-house was molested after its share of the money

had been paid. He was fully advised of what occurred in
the workings of the plans and designs, not only at the time
of the receipt of the $300, but at all times so long as the
system under which they were working continued. This
system was fully developed and exposed by Branch in his tes-
timony. It was properly admitted as a part of the transac-
tion by which the $300 was paid by Branch to the plaintiff
in error. The fact of the carrying out of this system was
proper evidence for the purpose of corroborating the testi-
mony of Branch, and showing the purpose, understanding and
intent with which the money was received as alleged in the
indictment, and for the purpose of showing the system under
which the several transactions were had. For these purposes
the testimony was competent. (*State* v. *Bridgman,* 49 Vt.
202, [24 Am. Rep. 124] ; *Thayer* v. *Thayer,* 101 Mass. 111,
[100 Am. Dec. 110] ; *Kramer* v. *Commonwealth,* 87 Pa. 299 ;
*Rex* v. *Hough,* Ross & R. C. C. 120 ; *Rex* v. *Ball,* Ross & R. C.
C. 132 ; *Commonwealth* v. *Price,* 10 Gray, 472, [71 Am. Dec.
668] ; *Rex* v. *Francis,* 12 Cox C. C. 612 ; *Regina* v. *Garner,*
4 Fost. & F. 346 ; Wharton's Criminal Evidence, sec. 38 et
seq.) ''

In *Moody* v. *Peirano,* 4 Cal. App. 411, [88 Pac. 380], it
was held in an action upon a warranty of certain seed wheat
as being ''White Australian,'' that evidence of similar war-
ranties to other parties at about the same time was admissible.
This court there said, speaking through Mr. Justice Harrison :
''The tendency of modern decisions is to admit any evidence
which may have a tendency to illustrate or throw any light on
the transaction in controversy, or give any weight in deter-
mining the issue, leaving the strength of such tendency or
the amount of such weight to be determined by the jury;
and in determining the relevancy of evidence that may be
offered upon an issue of fact much depends upon the nature
of the issue to sustain which or against which it is offered,
and a wide discretion is left to the trial judge in determining
whether it is admissible or not. Mr. Thayer, in the intro-
duction to his 'Cases on Evidence,' says: 'No precise or
universal test of relevancy is furnished by the law. The ques-
tion must be determined in each case according to the teach-
ings of reason and judicial experience. . . .' Probability is an
element which addresses itself to the reason, and is frequently

invoked in matters of human conduct and experience for determining the existence or nonexistence of a fact. In civil cases a jury is authorized to determine an issue of fact as its probability or improbability may appear to them from the evidence before them. Hence any evidence tending to show either of those conditions is relevant to the issue to be determined by them. If the evidence offered conduce in any reasonable degree to establish the probability or improbability of the fact in controversy, it should go to the jury.''

In that case the supreme court denied a petition for rehearing, and has since quoted the case with approval in *Bone* v. *Hayes,* 154 Cal. 767, [99 Pac. 172].'

The reasoning of that case in our mind is conclusive as to the admissibility of the evidence in this. Not only this, but the court, at defendant's request, instructed the jury that defendant was on trial only for the crime charged in the indictment; that even if the evidence should show that the defendant had been guilty of other crimes, still they should not convict unless convinced of defendant's guilt from the evidence of the precise offense charged to a moral certainty and beyond a reasonable doubt.

6. There was no error in the admission of the complaint which had been filed in the case of *Langdon* v. *Gallagher et al.* in the superior court, for the limited purpose for which it was admitted.

During the cross-examination of Wilson counsel for defendant called his attention to an affidavit which the witness had made in said case, and introduced the affidavit in evidence for the evident purpose of impeaching the witness by showing that in the affidavit he had sworn that he had never committed any felony, or been guilty of any crime of any kind against the people of the state. The complaint referred to was in the action brought to enjoin defendant from taking possession of the office of district attorney, and to test the validity of the order made by Gallagher, as acting mayor of San Francisco, removing Langdon and appointing defendant district attorney instead. The complaint was admitted in evidence in response to the cross-examination, and as a part of the transaction referred to in the affidavit. The court, at the request of the district attorney, limited the purposes of the complaint to simply being used as a part of the same

transaction, giving meaning to the affidavit which the defendant had introduced. Counsel for the defendant objected to the court making any order limiting the purposes for which the complaint was admitted, but the limitation was made notwithstanding that objection. The defendant attorney in offering the complaint stated that he offered it for the limited purpose of characterizing and giving meaning to and showing the proper relation to the complaint of the affidavit which was offered in evidence by the defendant during such cross-examination, and for no other purpose. An examination of the affidavit shows that it was entitled the same as the complaint, and that it contained denials of most of the averments of the complaint. Among other things the affidavit stated: "That this affiant has never committed a felony of any kind or character, has never been a party thereto, and there is not and can be no evidence presented of or concerning any felony committed by the undersigned or threatened by the undersigned. That it is not true that said fact was known to this affiant, either at the time mentioned in the complaint or ever or at all; that it is not true that the undersigned has, prior to the commencement or formation of the grand jury mentioned in the complaint, or ever or at all, or at any time or at any place, committed any felony, either in the city and county of San Francisco or any other place, and it is not true that the undersigned has been guilty of crime against the people of the state of California, or the people of the city and county of San Francisco, at any time or at all."

We must presume the jury to have been men of ordinary intelligence, and that they understood and acted upon the evidence for the limited purpose for which it was admitted and for no other purpose. In fact the affidavit, in order to be understood, must be taken and read in connection with the complaint. The court also instructed the jury that evidence admitted for a limited purpose was to be considered by the jury for such purpose and none other.

7. It is claimed that the court erred in refusing to grant defendant's motion made on November 15th to discharge the jury and impanel another jury, which motion was based upon the ground that the jury had become biased by the shooting of Assistant District Attorney Heney during the progress of

the trial, and by the circumstances in connection therewith. During the trial on November 13th, Heney, the assistant district attorney, was shot in the courtroom and badly wounded by one Haas, on account of an alleged or imaginary grievance which Haas held against Heney. The shooting caused great excitement, but at the time it occurred most of the jurors were in a hallway adjoining the courtroom and did not witness it, although they must have heard the shot and the loud noises and commotion caused by the shooting. The jurors had just started to enter the courtroom, two of them having passed the door when the shooting occurred. The deputy sheriff immediately pressed the jurors back into the jury-room and closed the door. Defendant was afterward, but not in the presence of the jury, placed in custody, and was guarded by five policemen in his trips to and from the courtroom. Public meetings were held, and the defendant denounced, and even insinuations were made by leading citizens against the courts. As the shooting took place during the trial, the public seemed to blame the defendant for such shooting. It does not appear that the jurors knew of these public meetings, or of the threats against defendant. The record and affidavits on the motion and the counter-affidavits take up about seven hundred folios of the record. It is sufficient to say that in our opinion the court did not abuse its discretion in denying the motion. There was no showing that any fact had reached any juror of sufficient importance to disqualify him. After the shooting on the following day the trial judge stated to the attorneys that in all probability the jury knew something concerning the transaction, and suggested that the attorneys agree on a statement of the facts to be given to the jury. The jurors had not been present and were not present when the motion of defendant was made. Counsel declined to agree upon a statement, or at least did not agree upon such statement, and upon the following day when court convened, the judge addressed the jury, telling them that Mr. Heney had been shot by Haas, that his wound was not serious, and that there was every indication that he would recover. The court further said: "Now that transaction, as far as the court and the jury, the defendant at the bar, the people of the state of California, the counsel and all others interested or involved in this trial are concerned, is to stand as though it had not occurred. No

person is to be charged with any responsibility for that transaction. It may be stated also to you that the assailant afterward took his own life while he was confined in the county jail upon his arrest in connection with that transaction; and neither matter, I repeat, should find any place in your minds. It should not in any manner form anything in the nature of bias or prejudice concerning anyone. This court would despair of having the law administered upon the charge at bar if the jurors did not in every manner comply with the admonition of the court to exclude that transaction from your minds.''

And in its instructions to the jury the court charged them that they were not to be influenced by any event which had occurred of which they had obtained knowledge since they were sworn to try the case. There was nothing to show in the remotest degree that the defendant was in any way connected with the shooting of Heney. There was nothing to show that any juror had become biased or prejudiced against defendant by reason of such shooting. The jurors were not at large, but were at all times kept in the charge of the sheriff.

It is insisted that the court should have allowed counsel to examine the several jurors under oath in order to ascertain if they had been biased or prejudiced by the shooting of Heney. In our opinion the court properly denied such permission. In a case of great importance, where weeks have been spent, and hundreds of jurors examined in the endeavor to get a fair and impartial jury, to allow either party to call a halt in the proceedings for the purpose of re-examining the jurors as to bias or prejudice that may have been caused by events which had occurred after the jurors were sworn, and with the sole purpose of endeavoring to find evidence of such bias or prejudice, would be a dangerous proceeding. If it could be granted to one side it could be to the other. It would turn the trial into a farce. It would put it in the power of one juror near the close of a long trial to deliberately disqualify himself, and compel the trial to be commenced over again. In many cases it would result in defeating the very object contemplated by a jury trial.

The same reasoning applies to the order denying defendant's motion for a new trial as it was based upon substantially the same grounds. Considerable stress is placed upon

the affidavit of defendant, used on his motion for a new trial, to the effect that he had endeavored to get the affidavits of each of the twelve jurors, naming them, but that they each had refused to give such affidavit. The affidavit of defendant then proceeds to state as follows: ''Affiant will further show by the testimony of said persons that one or more of them, within a short time following the said shooting, and before the conclusion of the trial of affiant, stated to Hon. William P. Lawlor that he, or they, were prejudiced against defendant on account of said shooting, and could not fairly and impartially try said cause, and requested of said Hon. William P. Lawlor that he or they be discharged from further duty as jurors herein; that said Hon. William P. Lawlor declined and refused to discharge said persons so applying to him, and directed them to continue to act as jurors in said cause.''

In a second affidavit the defendant sets forth expressions used by juror Bond as to his bias and prejudice against defendant while the case was being tried and after the shooting of Heney. He also sets forth that juror Murphy after the shooting went to the judge, and informed said judge that he did not think that he could fairly and impartially try the case, and requested the judge to discharge him from further duty; that his request was refused, and that the judge told said juror to keep his feelings to himself, and that he would in due time be properly instructed as to his duties as a juror. These statements in the second affidavit do not purport to have been made on information and belief, but they could have been based on nothing else. It does not appear how defendant knew the things he stated in his affidavits. The affidavits were therefore but hearsay, and were not sufficient to impeach the verdict of the jury. (People v. Findley, 132 Cal. 301, [64 Pac. 472].) Nor could the juror Murphy of his own volition, and during the progress of the trial, disqualify himself by going to the judge, and thus compel the trial to begin anew. He had qualified as a juror, and taken an oath to try the case according to the evidence, and if he afterward stated that he could not do so his statement would be of little value.

8. The court in its instructions to the jury read section 1323 of the Penal Code, and it is claimed that error was committed

in so doing within the rule laid down in *People* v. *Emmons,* 13 Cal. App. 487, [110 Pac. 151].

The Emmons case lends countenance to the defendant's contention, but the remarks there made as to reading section 1323 of the Penal Code must be construed in relation to the facts of that case and the circumstances under which the section was read. There the district attorney claimed that he was taken by surprise because the defendant had not taken the stand as a witness as he had done in a former trial, and asked permission to reopen the case in order to introduce material statements made by defendant on the former trial. The court permitted the case to be reopened, and admitted the statements or testimony given on the former trial. The defendant requested the court to give an instruction to the effect that the fact that defendant had not taken the stand and had not testified raised no presumption against him, and that the jury were not at liberty to draw any unfavorable inference against him for the reason that he had not taken the stand or offered himself as a witness. The court refused to give the instruction, and in lieu thereof read the section. It was the action of the court both in refusing the requested instruction and in reading the section (1323) instead, that was held to constitute error. It was there said, and properly said, that where a defendant had not taken the stand as a witness there could be no occasion for reading the section as it contained only an abstract proposition of law, but the court did not hold that merely reading the section would constitute error if the court had elsewhere fully instructed the jury as to the right of defendant to refrain from testifying, as to the fact that no inference could be indulged in against him on account of such failure to testify. In this case the court fully instructed the jury: "It is your duty as jurors throughout your consideration and your determination of this case to carefully and conscientiously abstain from indulging any and every inference or presumption, or consideration, in the least unfavorable to defendant, founded upon or arising from his not testifying in this case. There is absolutely nothing in that circumstance for you to consider in arriving at a verdict. The law requires of you, and it is your duty, to give no consideration at all and to attribute no significance what-

14 Cal. App.—39

ever to the fact that defendant had not testified in this case. Under no circumstances should you permit it to influence your minds, and you must not do so.''

And again, ''The defendant, Abraham Ruef, enters upon his trial with the presumption that he is an innocent man, and he is not bound or required to prove himself to be innocent. . . . And you should act upon the presumption of innocence and lack of intent during your entire consideration of the evidence, and until that shall have been overcome by evidence of his guilt so strong, so ample, so conclusive, as to convince your minds and the mind of each of you to a moral certainty and beyond a reasonable doubt that the defendant is guilty of the crime with which he is charged.''

We do not believe that the defendant could under the circumstances have been injured by the mere reading of the section in the abstract where the rule in the concrete was so fully and fairly stated elsewhere. In the Emmons case it was said: ''The instruction as requested contained a correct statement of the law pertinent to the issue, and under the circumstances it was very material to the defendant that it should have been given. The court in effect, instead of telling the jury that the failure of the defendant to testify should not create a prejudice or unfavorable inference in the minds of the jury, told them that the defendant could not be compelled to be a witness against himself, but if he offer himself as a witness he may be cross-examined by the counsel for the people as to all matters about which he has testified in chief.''

We are referred to *People* v. *Ryan,* 120 App. Div. 275, [105 N. Y. Supp. 160]. In that case the reversal was for the reason that the evidence was not sufficient to warrant a conviction. The instruction given was not excepted to, and the court after discussing it merely said that if it had been excepted to it would have constituted legal error. The section of the Code of Civil Procedure of New York (sec. 393) merely provides: ''The defendant in all cases may testify in his own behalf, but his neglect or refusal to testify does not create any presumption against him.'' The court in that case, however, did more than merely read the section. It stated that ''Where a defendant takes the stand in his own behalf, he is and can be subjected to all the forms of cross-examination as could any other witness in the case.'' Not only this, but it does

not appear in that case that any further or more explicit instruction was given. The court in instructing the jury read almost literally some thirty odd sections of the Penal Code and the Code of Civil Procedure as to direct and indirect evidence, presumptions, inferences, the various kinds of evidence, the knowledge of the court, the facts as to which a witness may testify, conspiracy, impeachment of witnesses, that the masculine gender includes the feminine, of what things courts take judicial notice, that the court must decide questions of law and the jury questions of fact, and finally the provision of the constitution that judges must not charge juries with respect to matters of fact.

We have no hesitation in saying that such practice is not to be commended. It can serve no useful purpose, and the many propositions of abstract law can find no lodgment in the minds of laymen from the mere reading of the sections. In fact the court might as well have read the first volume of Greenleaf on Evidence. Cases may arise in which to read an abstract proposition of law to the jury with a wrong application, and with no definite instruction on the same subject, would constitute error; and in fact the courts have so held in some cases under the peculiar facts of the case; but we know of no case where it has been so held if the court elsewhere specifically instructed the jury upon the point covered by the abstract proposition. In this case many of the instructions so read are complained of as constituting error. We have not the time nor the space to discuss them separately. The most plausible ones on which to predicate error, for instance, is the fact that the court read to the jury the portions of section 2061 of the Code of Civil Procedure, as follows:

"The following presumptions and no other are deemed conclusive. . . .

"5. That evidence willfully suppressed would be adverse if produced;

"6. That higher evidence would be adverse from inferior being produced. . . ."

And also that part of section 1963 as follows:

". . . 6. That evidence is to be estimated not only by its own intrinsic weight, but also according to the evidence which it is in the power of one side to produce and of the other to contradict; and therefore,

"7. That if weaker and less satisfactory evidence is offered, when it appears that stronger and more satisfactory was within the power of the party, the evidence offered should be viewed with distrust."

It will be seen that section 2061 of the Code of Civil Procedure provides that the jury are to be instructed "on all proper occasions" as provided in the various subdivisions of the section. The only question is as to whether or not this case presented a proper occasion for such instruction. It would have to appear clearly not only that the occasion was not a proper one, but also that under the circumstances the instruction was misleading and injurious, before we would be justified in holding it to be erroneous. It was claimed by defendant's counsel in his argument that the district attorney could and should have called as witnesses the ex-supervisors other than the three called. In fact, the defendant had asked the court to instruct the jury that if it was within the power of the prosecution to produce the other ex-supervisors, and that such ex-supervisors could have testified as to matters material to the case, "then I charge you that the law presumes that the testimony of such ex-supervisors not produced as witnesses herein, if offered, would have been adverse to the prosecution in this case. (Code Civ. Proc., sec. 2061, subds. 5, 6, sec. 1963.) "

The court refused to give the instruction as worded, evidently because it was argumentative and singled out certain witnesses, and was made to apply to the prosecution and not to the case generally; but in lieu of giving the instruction as requested, the court read the portions of the section as herein stated. The defendant by his request, having invoked the principles of law stated in the sections, and cited the sections as authority, and asked the court to instruct in regard to them, cannot now complain because it was not a proper occasion for giving such instructions. As to the abstract proposition "that evidence willfully suppressed would be adverse if produced," there is nothing to show that defendant willfully suppressed any evidence unless it might be claimed that he could have taken the stand himself; but such fact was not the suppression of evidence within the meaning of the statute, but was only the exercise of a right given to the de-

fendant under the law, the jury having been fully instructed as to such right.

We cannot presume that the jury thus applied an abstract proposition in the face of the direct and positive instruction that no inference or presumption unfavorable to defendant can be indulged in by the jury by reason of the defendant not testifying, and that "there is absolutely nothing in that circumstance for you to consider in arriving at a verdict."

In *People* v. *Cuff,* 122 Cal. 589, [55 Pac. 407], the court gave an instruction based upon section 2061; but instead of reading the section (as in the case at bar) commenced by saying, "The court instructs you, etc." The instruction was held to be erroneous, but the case was reversed upon other grounds in addition to the giving of the instruction, and there is nothing in the case to show that the jury were instructed elsewhere upon the right of the defendant to remain silent.

*People* v. *Charles,* 9 Cal. App. 399, [99 Pac. 384], merely follows the case of *People* v. *Cuff,* and the court in that case said: "The effect of the entire charge of the court was to specifically direct the erroneous instruction toward the defendant's case."

Where the occasion is proper for the giving of an instruction it cannot be given in a better form than as laid down in the code. In *People* v. *Dobbins,* 138 Cal. 698, [72 Pac. 342], the court said: "But nowhere has it been decided, nor indeed could it with reason be held, that it is error for the court to instruct in the language of our written law. This is substantially what the court here did, and so, while the instruction cannot be commended as a full and clear exposition of the meaning of the section of the code, still it cannot be said that it was error for the court in giving the law to have conformed to the language of the code, and to have omitted what that code itself omits."

It has been many times held that if other instructions were given which qualify and explain an objectionable instruction the judgment will not be reversed. (*People* v. *Morine,* 61 Cal. 369; *People* v. *Bruggy,* 93 Cal. 484, [29 Pac. 26].) In the latter case it was also said: "The practical administration of justice should not be defeated by a too rigid adherence to a close and technical analysis of the instructions of the court. The instructions are for the enlightenment of the jury as to

the law of the case, and the jury never enters into such a character of analysis in construing them.''

We therefore conclude that as the court specifically instructed the jury upon the material questions before them, the reading of the code sections did no harm.

10. The court instructed the jury that ''One who offers a bribe is not for that reason alone an accomplice of the one to whom it is offered; and one to whom a bribe is offered or who asks or agrees to receive a bribe is not, for that reason alone, an accomplice of one who offers a bribe''; and the claim is made that the said instruction is erroneous.

The court elsewhere instructed the jury, as contended by counsel, that both Gallagher and Wilson were accomplices, as appeared from their own testimony, and this instruction is not questioned. It was held in *People* v. *Coffey,* 10 Cal. App. Dec. 419,* that one who receives a bribe is not for that reason an accomplice of one who gives a bribe, and the reason there given need not be here repeated. It is insisted now—and was the theory of the defendant at the trial—that Furey had entered into a conspiracy with Gallagher, Wilson, the defendant and other supervisors, for the purpose of obtaining money by reason of the official action of said board of supervisors in all matters which might come before the board in which money could be obtained, as for franchises or permits, and that such combination continued up to the time the offer in this case was made to Furey. Defendant upon this theory of the case asked the court to instruct the jury to the effect that if they should find that defendant and the other supervisors, together with Furey, entered into such general plan and scheme to obtain money from all persons for permits and franchises, then Furey was an accomplice; and defendant also asked further and separate instructions by which the court was requested to instruct the jury that Furey was in fact an accomplice.

The court properly refused such instructions. The word ''accomplice,'' as used in the statute, means an accomplice in the commission of the offense charged and which is under investigation. Here the offense charged was an offer by defendant to bribe Furey. There is no evidence that Furey

*Rehearing pending in the supreme court.

entered into a combination or agreement with the defendant and other supervisors to offer a bribe to himself. If the crime of some party who had paid money under such combination or conspiracy had been the subject of investigation, or if the unlawful conspiracy had been the subject of the trial, then no doubt all parties to it would have been accomplices, but they would have been accomplices to a different crime than the one charged· here. The witness Furey could not have been an accomplice in the offer to bribe himself. It might have been known to defendant that Furey was willing to accept bribes. In fact Furey might by his conduct have invited bribes; but the offer to bribe in this particular case is the offense with which the defendant is charged and of which he was convicted. The court elsewhere fully and fairly instructed the jury in regard to the subject of accomplices, and left it to them to decide provided they should find the evidence to fit the instructions as given. They were instructed at the request of the defendant: ''Any person who aids and abets another in the commission of any crime, or advises and encourages its commission, is an accomplice of such other person. Where two or more persons are concerned in the commission of a crime, whether they or either of them directly commit the act constituting the offense or aid and abet in its commission, or not being present they advise and encourage its commission, each one of them is an accomplice of the other. The word 'accomplice' includes all persons who have been concerned in the commission of an offense; and the grade or degree of the guilt of such person is not important. . . . And in this connection you are instructed that if you have a reasonable doubt upon the question of whether a witness is or is not, was or was not, an accomplice, you must resolve that doubt in favor of the defendant; and if you have a reasonable doubt as to whether there is or is not other evidence which, in itself independent of and without the aid of the testimony of the accomplice or accomplices, tends to connect the defendant with the commission of the offense charged, you must resolve the doubt in favor of the defendant and acquit him.''

The witness Furey did not testify to any direct guilty participation of defendant as to the offer made to him. He testified that the offer was made by Gallagher, and did not

pretend to know defendant in the transaction. He did not even testify that defendant ever mentioned the matter to him. It was only Gallagher and Wilson who, by their testimony, connected the defendant with the offer. It was the testimony of these two that showed the commission of the offense by defendant. The law required other testimony tending to connect defendant with the commission of the offense. As we said in *People* v. *Coffey,* "At common law the jury had the right to convict upon the uncorroborated testimony of an accomplice; and it is only by reason of the statute that it is not allowed here. The statute cannot be construed in a loose or popular sense, but must be interpreted and accepted as recognized by law-writers and as it was evidently intended by the legislature when it made the bribe-taker and the bribe-giver each guilty of a different crime."

We certainly do not deem it our duty in this case to hold that the court should have given instructions that would have had the effect of telling the jury that the witness Furey was an accomplice because of an agreement between himself and the defendant with other supervisors to get money from other third parties not named in this indictment.

11. It is claimed that the attorney for the people was guilty of such misconduct in his argument to the jury as to call for a reversal of the case.

During such argument he referred to the fact that the attorney for the United Railroads was not called as a witness; that the attorney was the party who handled the money; that if the transaction was honest and fair, he should have been placed upon the stand by the defendant to explain it. The attorneys for the defendant assigned the remarks as misconduct, and excepted to them. Then some discussion arose, the district attorney claiming that such comment had been held not to be error in *People* v. *Yee Foo,* 4 Cal. App. 730, [89 Pac. 450]. The district attorney remarked that he did not desire to make any claim that he was not entitled to make, whereupon counsel for defendant said: "If there is any damage done, you have done it. Go on with the argument." After the above remark the court made no ruling as to the matter, and the district attorney was allowed to proceed. It would seem that the defendant's attorney, by the remark, waived a ruling upon the question; but it is sufficient to say

that it was expressly held in the Yee Foo case that it was not error for the district attorney to refer to the fact that a codefendant had not been called as a witness. The reasons for the rule, and the authorities in support of it, are there fully given, and it is useless to here repeat them.

The attorney for the prosecution in the heat of his argument referred to the disappearance of Lathan, an important witness for the prosecution, evidently intending to infer that it was the United Railroads or the defendant who had had him decamp, and continuing the argument used these words: "Away with suborners of perjury. Away with bribers of witnesses. Thank God some of them are on their way to state prison now, and some of them are being tried to-day—" Here counsel for defendant said: "We desire now to take an exception to the remarks of counsel about the bribers of juries and that some of them are on their way to state prison, as being entirely outside the record, unwarranted, unjustified, plainly prejudicial, and ask the court to so instruct the jury, and to command counsel to desist." In response to this the court said: "The jury will disregard any statement made by counsel which is in excess of the testimony."

Further in his argument, claiming that the defendant was not sincere, the attorney for the people said: "I listened to the remarks of the gentleman who just has been entering his exception; I listened to his dulcet tones throughout this trial. I listened as I thought to the ring of insincerity last night, and memory came back to me as I recalled another voice with the same ring, with the same insincerity in it, and I recalled that we had in our midst once before a man that had the same method and that same way, Mr. George Dozier Collins, who no longer is among us, but Mr. George Collins Dozier has returned to be with us. And so let it be." Here counsel for the defendant said: "Now, I take an exception to that remark, and ask the court to direct the counsel to desist as being unwarranted, unauthorized, insulting and unnecessary misconduct upon the part of the district attorney." The court in reply said: "Counsel will refrain from personal allusions to counsel on the other side. You must refrain from anything that is not justified by something said by counsel during the trial of this case."

Again the counsel for the people said: "Again, they talk to you about the dreadful torture chamber, about the awful things that occurred on Fillmore street, and about the guards that surrounded this man, and how he was tortured. Why, don't you recall that at that time he was on trial, daily in court, attended by attorney Ach and Shortridge and Murphy and Fairall—I don't know but others—every day in court—" Counsel for the defendant took exception to the remarks on the ground that there was no evidence that the defendant was ever on trial in any court, and claimed that the remarks were prejudicial misconduct on the part of the district attorney. After some discussion as to whether or not the record showed that defendant had been on trial, and had changed his plea, the court remarked: "The jury will be guided by what their recollection is upon the subject." There was some testimony in the record that the defendant was formerly in court upon a charge of extortion, and that he had changed his plea from "not guilty" to "guilty." The witness Sinsheimer related a conversation with the defendant after he had entered such plea as to his reasons for so doing, in which defendant stated to him in substance that on account of the circumstances a case might have been made out against him as to some of the charges, and on account of his aged father and mother he had concluded to enter a plea of "guilty." In fact, reference was made by defendant's attorney to such plea of "guilty" in the extortion case while examining jurors and at other times during the progress of the trial. The remarks of the district attorney were therefore based upon the record. Not only that, but it does not appear that the sentence of the attorney for the people was completed, so that the matter that he was going to recall to the attention of the jury was not placed before them.

The above are all the instances to which our attention has been called where the defendant excepted to the remarks of counsel. In our opinion, the remarks, in so far as they might have been injurious, were cured by the rulings of the court, and there is nothing in the remarks of sufficient importance to call for a reversal of the case. In *People* v. *Yee Foo*, 4 Cal. App. 730, [89 Pac. 450], it was held that remarks made during the argument of counsel to which no objection was made, and no motion made to strike them out, were not errors

upon which a case could be reversed. The court there said:
"District attorneys, in their zeal to obtain convictions, often
overstep the proper bounds, and by intimation, innuendo or
statement get before the jury matters not in evidence. When
such course has been willfully pursued, or where something
is stated or represented as a fact, and the statement is damag-
ing and not borne out by the record, the courts of appeal
have not hesitated to reverse the case and grant a new trial.
But in the argument of a case, where counsel has become
zealous in his cause, and upon his own view of the case works
his mind up to believe certain things, he is apt to exaggerate
and draw upon his imagination. We apprehend that this is
well known to juries, and for this reason it would have to
be a clear case of misconduct on the part of the district attor-
ney to justify a reversal"—and many cases were cited in
support of the ruling. The court in that case further said:
"The court was not asked to strike out the objectionable re-
mark, nor does it appear that the court ruled upon the excep-
tion. It is but fair to require defendant's counsel, in the
case of objectionable remarks by the district attorney, to call
the court's attention to them then and there, and invoke the
aid of the court to prevent the remarks from injuring the
defendant, before he will be allowed to urge the matter as
error in this court. In such case this court will not hold the
remark error upon which to reverse the case." See further
the authorities cited in *People* v. *Yee Foo,* 4 Cal. App. 730,
[89 Pac. 450], and *People* v. *Kramer,* 117 Cal. 647, [49 Pac.
842].

The rule requiring that the remarks of the district attor-
ney must be willful, not supported by the record, and must
contain a statement of something as a fact, either by direct
statement or innuendo, and further that they must have been
objected to or the court's attention called to them, or else
they will not be held error sufficient to reverse a case, is
founded upon principles of justice and fair dealing. While
such remarks when not justified might in some cases be preju-
dicial error and injurious to defendant, in other cases such
remarks might prejudice the district attorney in the eyes of
the jury. Each case must be judged by its own particular
circumstances, and in our opinion, taking the remarks in this

case, with the corrections and statements by the court, they could not have worked any injury to the defendant.

Finally, we have examined the other alleged errors, but find nothing which is of sufficient importance to justify a reversal of the case. The defendant presented one hundred and eighty-five written instructions, and necessarily many of them were repetitions or given elsewhere, and the court was justified in refusing them. Taking the instructions that were given, we think the jury were fully and fairly advised in regard to the law appertaining to every phase of the case.

It is somewhat of a reflection upon the mode of administering the laws that the trial of a simple question, as to whether or not the defendant offered a bribe to Furey, a supervisor, should take up the time of the court and of the jury for months, and create a record of such amazing proportions. There were only two or three witnesses as to the main fact. Most of the testimony was as to matters and things that have no bearing upon the case. It is evident that in such case where, through the machinery provided by law, a jury has finally passed upon the question of fact and found the defendant guilty, and the evidence is sufficient to support the verdict of the jury, it should not be set aside or disturbed for light or trivial reasons. This rule has always been adhered to by this court and by the supreme court of the state.

The judgment and orders are affirmed.

Hall, J., and Kerrigan, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on December 23, 1910, and the following opinion rendered thereon:

THE COURT.—On this petition for a rehearing the defendant claims for the first time that the indictment does not state facts sufficient to constitute a public offense, for the reason that it fails to allege that the board of supervisors of the city and county of San Francisco had jurisdiction to enact the ordinance granting a franchise to the United Railroads to operate an overhead trolley system.

The proposition contended for is that the defendant, after having offered a bribe to a member of the board of supervisors for the purpose of corruptly influencing the official

action of said member, and after having succeeded in procuring the action of the board in his favor and as he desired, can now be allowed in a court of justice to question collaterally the power of the board to do the very thing which he offered to pay its members to do.

If we considered the contention as serious, it is sufficient to say that we will not now grant a rehearing to consider a question which was not even raised in the ten volumes of briefs on file at the time we rendered our decision.

The petition for a rehearing is denied.

On December 31, 1910, the defendant filed in the supreme court a petition for the transfer of the above case from the district court of appeal to the supreme court for hearing. On January 23, 1911, what purported to be an order of the supreme court, dated January 22, 1911, was filed in the office of the clerk of that court, assuming to grant the application for a hearing in the supreme court. This order was signed by Justice Henshaw on January 10, 1911; by Justice Melvin, on January 19, 1911; by Justice Lorigan, on January 21, 1911, and by Chief Justice Beatty on January 22, 1911. On January 11, 1911, Justice Henshaw departed from the state of California, and thereafter continuously remained without its limits until after the twenty-second day of January, 1911. Thereafter the attorney general of the state of California made a motion in the supreme court for an order vacating the order of transfer of January 22, 1911, on the ground that it was a nullity and was inadvertently made and entered. At the opening of the argument on the motion, Mr. Chief Justice Beatty, for the court, made the following statement:

THE COURT.—After consultation, the court has thought it proper to make the following statement, so that the legal discussion may proceed upon an express and distinct understanding of the facts.

*In the matter of judicial opinions and decisions:* During the service upon this bench of every member of it, and as we are informed, ever since the organization of the court, the uniform practice has been as follows: The chief justice assigns to the justices in regular order the causes pending in bank. Each justice to whom a case is assigned prepares his

opinion with or without consultation with other justices as he elects. Having prepared and signed his opinion, it is passed on to his associates for consideration. If in due course it is signed by three or more of his associates, it then expresses the opinion and judgment of a majority of the court, and when finally handed to the secretary and by him transmitted to and filed with the clerk of the court, it becomes the opinion and judgment of the court.

The court never convenes as a court, nor in chambers, in consultation, to approve opinions so signed previous to their filing. When they bear a sufficient number of signatures and all the justices have examined the same and have had an opportunity to express their assent or dissent, they are filed, usually at the instance of the author.

Signatures are thus separately attached, frequently with intervals of weeks or months between the respective dates of signing as one or another justice may defer action until he has completed his examination. When he has done so he then passes the opinion on to the next associate. In so filing opinions and decisions, no account has ever been taken of the matter whether at the time of filing any justice whose signature the decision bears is or is not at the place where the court is held.

*In the matter of applications for hearings before the court in bank after decision in department, for hearing before the court after decision by the court of appeals, and for rehearings by the court in bank after decision in bank,* the uniform practice is and has been for the justices to meet in consultation for their consideration. It has been a not uncommon practice for a justice who believes a hearing or rehearing should be granted, and who, for any reason, will not be present at such consultation, to affix his signature to the order granting a hearing or rehearing in advance of such consultation. Such signatures attached to orders for hearings and rehearings have always been regarded by the court as valid, although at the time the order granting the hearing or rehearing takes effect, the justice so signing may be absent from the place where the court is held. When signed by a sufficient number of justices, the original order is delivered to the secretary. In cases of petitions for hearing or rehearing of causes decided by this court, the original order, and in cases

of petitions for a hearing after decision in the courts of appeal, a copy of the order is filed with the clerk of the court.

It has also been a matter of frequent occurrence for an opinion or decision, or for the order granting a hearing or rehearing to be sent or taken to an absent justice for his action thereon apart from any consultation and from the presence of his associates.

It has happened several times that a member of the court has been absent from the state for a period of time varying in length from two to eight weeks. In filing opinions and decisions and orders for hearing or rehearing, no question has ever been raised as to whether at the time of filing any justice whose signature the decision or order bears is or is not within the state. The court has not heretofore been called upon to consider the effect of the absence of a justice from the state at the time an order signed by him was made.

This court has never considered that the presentation of an application for hearing or petition for hearing or rehearing is necessary or prerequisite to the exercise of its jurisdiction to consider and review for the correction of errors. It has always acted in the belief that it is vested with this constitutional power to be exercised of its own initiative in any appropriate case.

The attorney general, we make sure, will join the court in saying that the facts contained in his affidavit on file herein were freely made known to him by the court, and he was advised by the court that it would welcome the motion here made and now to be considered.

BEATTY, C. J.<br>
HENSHAW, J.<br>
SHAW, J.<br>
ANGELLOTTI, J.<br>
LORIGAN, J.<br>
SLOSS, J.<br>
MELVIN, J.

Thereafter, on February 28, 1911, the following opinion was rendered granting the motion to vacate the order of January 22, 1911.

This is a motion made by the attorney general of the state for an order vacating an order of this court, dated

January 22, 1911, and filed in the office of the clerk of this court on January 23, 1911, assuming to grant the application of defendant in the above-entitled cause for a hearing of said cause in this court after decision by the district court of appeal for the first district (*ante*, p. 576, [114 Pac. 54]). The motion is based on the ground that the said order is a nullity and was inadvertently made and entered.

While several claims are urged in support of this motion, there is but one deemed by us to be of any importance, or as affording any ground for doubt as to the validity of the order in question. Upon the first point made by the attorney general, which is, as we understand it, that no decision or order can be made by this court except when a sufficient number of justices are personally present at the place where court is held and there assembled as a court, and concur therein, we do not entertain any doubt whatever. The practice of this court in this behalf has been fully outlined in the unanimous statement of the court filed at the commencement of the argument on this motion. This statement will be published in our reports preceding this opinion. It is enough to say, in answer to the point, that the joint action or concurrence of four justices is the thing required to constitute the action of the court, and that, in contemplation of law, this joint action is taken when four justices have in writing declared their concurrence in a particular order or judgment, with intent to make it an order or judgment, and it is immaterial whether their respective signatures are appended when they are together, or whether they are made separately, at wide intervals of time and place, provided, always, that at the time such order or judgment becomes effective such four justices are qualified to act in the particular matter.

The facts material to the consideration of the real question presented by this motion are not at all in dispute, and, so far as necessary, were furnished to the attorney general by the members of this court. We will briefly recite them.

The appeal of the defendant from the superior court to the district court of appeal was decided by that court on November 23, 1910. The judgment of the superior court and its order denying defendant's motion for a new trial were affirmed. Under the provisions of section 4 of article VI of the constitution, the judgment of the district court of appeal

became final in that court at the expiration of December 23, 1910. The supreme court was by said section empowered to order said cause to be heard and determined by the supreme court, provided, however, that such order was made "within thirty days after said judgment" became final in the district court of appeal. The language of the constitutional provision is: "The supreme court shall have power to order any cause pending . . . before a district court of appeal to be heard and determined by the supreme court. The order last mentioned may be made before judgment has been pronounced by a district court of appeal, or within thirty days after such judgment shall have become final therein." It is necessarily conceded that the expiration of said period of thirty days without the making of such an order by this court ends its power in that regard and renders the judgment of the district court of appeal final for all purposes. (See, as bearing on this question, *Adams* v. *Dohrmann,* 63 Cal. 420.) The last day for action by this court in this cause was, therefore, January 22, 1911. A petition on behalf of the defendant invoking this action by this court was duly filed herein on January 3, 1911, and there was thereupon prepared by our secretary, in accordance with the usual custom, a form of order granting the application, which was, as is usual in such cases, left in the chambers of the chief justice to be subscribed by such of the justices as were in favor of such granting. On January 10, 1911, Justice Henshaw, being about to depart from the state for a brief absence extending beyond the period within which the order might lawfully be made, and believing that the application should be granted, subscribed his name to said order so prepared. On January 11, 1911, he departed from the state, and thereafter continuously remained without its limits until the period expired within which said order might lawfully be made. On January 19, 1911, Justice Melvin, deeming that the application should be granted, subscribed his name to said prepared form of order. On January 21, 1911, the remaining five justices of this court namely, Chief Justice Beatty, and Justices Shaw, Angellotti, Lorigan and Sloss, met in the chambers of the chief justice for consultation regarding said application, and Justice Lorigan, deeming that the application should be granted, sub-

scribed his name to said order. Justices Shaw, Angellotti and Sloss declined to concur in such order, and the chief justice reserved his decision in the matter until January 22, 1911, when he, having concluded that the application should be granted, subscribed his name to the order. The order was filed, by copy, in the office of the clerk of this court on January 23, 1911, the original order, in accordance with our uniform practice, being retained in the office of our secretaries.

We are entirely satisfied that the filing of the order in the clerk's office within the prescribed time was not essential to its validity, if it was otherwise regularly made by a majority of the court. (See *Niles* v. *Edwards*, 95 Cal. 41, 43, 47, [30 Pac. 134].) It is clear that to make such an order there must, under the constitutional provision already set forth, be a concurrence therein of a majority of the members of the court, namely, four justices. As only three justices concurred in this order if Justice Henshaw be excluded from consideration, the real question presented by this motion is the effect of his absence from the state commencing prior to any action on the part of the other three justices in the matter and continuing until after the time expired within which such order might legally be made.

It cannot be doubted that the granting of an application for a hearing in this court after decision by a district court of appeal is the exercise of a purely judicial function. It is admitted by learned counsel for defendant that a justice of this court can exercise no judicial function while absent from the state of California. The authorities agree upon the proposition that a judicial officer must exercise his judicial power within the territorial limits of his jurisdiction, and that any attempted exercise thereof while without such territorial limits is, in the absence of express provision of law authorizing the same, a nullity. In the *Matter of Steele*, 156 Fed. 853, Hundley, J., says: "I fail to find a single case or authority wherein the judge is held to be the court, or a part of the court, while absent from the territory prescribed by law within which the court is required to be held." An examination of such authorities as we have been able to find, including all that have been cited in the argument, shows nothing to impugn the accuracy of this statement. In the opinion of Justice Anderson in *People* v. *Wells*, 2 Cal. 219, we find an interest-

ing discussion of the distinction between the vested right of tenure in the term of a justice of the supreme court, and the functions of that office. He says: "The vested right of tenure for the term carries with it the privilege of enjoying certain emoluments. This vests solely that personal right, which only determines the power of exercising the functions of the office, under particular qualifications of time and place." While a justice continues within the state, the vested right in the tenure of the office is determinative of the functions, and they attach by reason of that vested right. "But the moment the judge passes beyond the territorial line, they cease to exist. Anywhere within the state, he has certain prescribed functions. . . . But when he absents himself from the state, his vested right of tenure in the term of the office is distinct from that, and is not parted from by him, but attaches to his person. It goes with him, and keeps with him. The *functions* of the office are left behind, and cannot be taken out of the state. They become temporarily vacant." While this discussion was contained in the opinion of only one of the three justices of the court, there is nothing in the other opinions that is at all inconsistent therewith, and while it cannot be taken as having the force of a decision on the question, it appears to us to be a correct statement of the law. In *Lynde* v. *County,* 83 U. S. 6, [21 L. Ed. 272], the supreme court of the United States made a distinction between the exercise of judicial power and the performance of ministerial acts by one occupying a judicial office and clothed by law with authority to perform such ministerial acts, saying: "Judicial power is necessarily local in its nature, and its exercise, to be valid, must be local also." In *Phillips* v. *Thralls,* 26 Kan. 780, the supreme court of Kansas, speaking through the late Justice Brewer, then a member of that court, said: "Unquestionably, a judicial officer must exercise his jurisdiction within the territorial limits of that jurisdiction. This, as a general proposition, will not be questioned by any one. . . . Every act of jurisdiction exercised by a judge without his territory . . . is null." In the later Kansas case of *Dunn* v. *Travis,* 45 Kan. 541, [26 Pac. 247], a judge of a district court of Kansas, while in the state of Illinois, made an order extending the time within which a case for the supreme court on appeal from his court could be served, set-

tled and signed. The order was held to be a nullity, the
court saying: "The order extending the time is therefore a
nullity, as it will not be seriously contended that he could
make judicial orders while absent from his district." In
*Buchanan* v. *Jones,* 12 Ga. 612, a judge of the superior court
granted a writ of *certiorari* while out of the state. This was
dismissed on the ground that judges of the superior court
of that state have no authority to do any official act required
by the laws thereof, beyond its jurisdiction. The court said:
"His official acts derive all their force and authority from
the constitution and laws of *this* state, which are only coex-
tensive with the territory thereof. . . . When a judicial officer
of this state goes beyond the operation of the laws by virtue
of which all his official acts derive their binding force and
authority, he cannot be considered as acting *there*, in obedi-
ence to the mandate of the sovereign will of the state, for the
simple reason that that mandate of the sovereign will of the
state has no extraterritorial operation." In *Price* v. *Bayless,*
131 Ind. 437, [31 N. E. 88], a temporary restraining order
was made by an Indiana judge while in the state of Michigan,
and the Indiana supreme court said: "This action was un-
questionably erroneous. His authority as judge was con-
ferred alone by the constitution and laws of this state. Our
laws have no extraterritorial operation. When the judge
passed the boundaries of the state, the power to exercise
judicial functions did not follow him. He could not, as
judge, sit in chambers in the state of Michigan and issue a
valid restraining order."

In view of what has been said it is clear that the concur-
rence of a justice in an order granting an application for a
hearing in this court after decision and judgment by a dis-
trict court of appeal, cannot lawfully be given while such
justice is not within the state, and, as we understand the
argument of learned counsel for defendant, it is not claimed
that Justice Henshaw could have assisted or participated in
any way in making the order effectual as an order of this
court while he was absent from the state, had he not indi-
cated his assent before leaving the state by subscribing his
name thereto. This brings us to what is, in fact, the only
real question presented by this motion, viz., the effect, during
his absence from the state, of Justice Henshaw's signature

to this order, such signature having been attached thereto prior to his departure from the state.

We have seen that the concurrence of four justices is essential to the validity of an order of the character here under consideration. This necessarily implies a concurrence of four justices, qualified and with power to act, at the very moment of action as a court, or, to put it in the language of the New York court of appeals in the *Matter of Kings County etc. Co.,* 78 N. Y. 383, "when the decision is actually made." In that case the court was composed of three justices, any two of whom had power to render judgment. A motion to confirm a report of commissioners had been argued before three justices, and one of them had departed for Europe before any decision was reached. While absent from the state, he communicated his decision to the chief justice. The two justices remaining in the state, one of whom was the chief justice, then attempted to decide the case, one being for confirmation, the other opposed, upon the theory that the communication from the absent justice was sufficient to make a concurrence of two, and sufficient therefore to render a judgment, and an order was entered accordingly, one of the two justices present dissenting. The order so made was held to be a nullity, the court saying: "That the absent judge has previously indicated his conclusion is not enough, for he must participate or take part when the decision is actually made, to render it lawful." It is not necessary here to determine just when an order granting such hearing is actually made, whether when, at any time prior to the expiration of the thirty day period, four justices have assented thereto and have subscribed their names to the order as a decision of the court, or when, the order not having as yet been filed, but bearing the signatures of four justices, the time expires within which such action may lawfully be had. Such order certainly is not made until four justices have concurred therein.

The word "concurrence," as used in this connection, means agreement or union in action and design. There must be such agreement or union on the part of at least four justices qualified to act to make such an order effectual as an order of this court, and the uniting therein on the part of each justice is an exercise by him of a judicial function. When Justice Henshaw left the state, no other justice had joined with

him in assenting to such order, and the assent theretofore given by him amounted to nothing more than an indication by him to his associates of his then willingness to concur with three or more of them in such proposed order. If he had thenceforth remained within the state, and three other justices had within the time allowed by law also indicated their assent by signing the order, the consent of Justice Henshaw, indicated by his signature, if the same had not been withdrawn by him, would have shown a concurrence of four qualified justices in the order, his previously indicated consent continuing to the time of such concurrence. It is undoubtedly true, and is the settled practice of this court, that any justice may withdraw his previously indicated assent to either decision or order at any time before the decision or order is actually made. It is likewise true that such previously indicated assent on the part of any justice to either decision or order is ineffectual for any purpose, if, pending the actual making of the decision or order, such justice dies, or, for any reason, ceases to be a member of this court. The reason that this is true is that his previously indicated assent becomes ineffectual for any purpose the moment that he is no longer able to exercise judicial functions (*Broder* v. *Conklin,* 98 Cal. 360, [33 Pac. 211]), and that an assent, to be in any way effectual to the making of a decision or order, must be operative at the moment of the making of the decision or order. There is no difference material to the motion under consideration between the facts in the case at bar and the case of a justice who has died, or who has otherwise ceased to be a member of the court. The moment Justice Henshaw left the state, in view of the authorities already referred to, he became unable to exercise any judicial function as a justice of the supreme court, in this state or out of it, and this disability continued during the whole period of his absence. During that time his situation was the same as if he had absolutely ceased to be a member of this court. It is true that there was a suspension, only, of his judicial power, instead of a final abrogation thereof, but the suspension, while it continued, was as absolute in its effect on his judicial power as would have been a complete vacancy in his office. Assent to or concurrence in a decision or order of the court being the exercise of a purely judicial function, his previous pro-

posal to concur in a proposed order, one that had not yet been made and one that had not yet received the assent of other justices making it an accomplished decision, temporarily ceased to be effectual for any purpose, and so continued ineffectual for any purpose during the whole period of his absence. Such previously indicated willingness to concur could not accomplish that which the absent justice himself could not accomplish. The time having expired before he returned it follows that he never concurred with even a single other justice in the purported order. Admittedly this order, if it ever did become effectual, did not become so until January 22, 1911, when the fourth justice appended his name. At that time, however, Justice Henshaw could not effectually join therein, because of his absence from the state, and his previously indicated willingness to join therein could have no legal effect. The result is that only three justices of this court concurred in the purported order, and as such order could be made only by the concurrence of four justices, it was ineffectual for any purpose and void.

As was said in our written statement filed at the commencement of the argument on this motion, the question of the effect of the absence of a justice from the state at the time a decision or order signed by him is made, has never heretofore been raised in this court, and it was taken for granted by all the justices, including Justice Henshaw, that the absence of such justice would not preclude him from participating in such decisions and orders as he had signed prior to his departure from the state. The mere suggestion of the point made in support of the pending motion and discussed in this opinion was sufficient to raise in our minds the gravest doubt as to the correctness of this conclusion, and our subsequent consideration of the question has left us entirely satisfied that the point is well made.

It therefore follows that the purported order must be held to be void for want of concurrence therein of the necessary number of justices. Without such concurrence there could be no valid order, and it becomes the duty of the court to strike the void order from its records. The order being void, jurisdiction of the case is still in the district court of appeal for the first district for action under its final judgment, from which court it has never, in truth, been removed, and it will

be the duty of our clerk, upon the purported. order being vacated, to return the original record to the clerk of such district court of appeal.

The order of January 22, 1911, filed January 23, 1911, assuming to grant the application of the defendant in the above-entitled cause, for a hearing in this court after decision in the district court of appeal for the first district, is vacated.

ANGELLOTTI, J.
BEATTY, C. J.
HENSHAW, J.
LORIGAN, J.
MELVIN, J.
SHAW, J.
SLOSS, J.

Subsequently, on March 13, 1911, the defendant filed a petition in the supreme court for a rehearing of the motion of the attorney general to vacate the order of January 22, 1911. Such petition was denied by the supreme court on March 30, 1911.